O

JS - 6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

FINN PETTE, et al.,                        )   Case No. CV 12-09324 DDP (PJWx)
                                           )
                    Plaintiff,             )
                                           )   **ORDER RE: MOTIONS TO DISMISS**
         v.                                )
                                           )
INTERNATIONAL UNION OF                     )
OPERATING ENGINEERS, a trade               )   [Dkt Nos. 212, 213, 214, 215,
union, etc., et al.,                       )   216, 217, 218, 219, 220]
                                           )
                    Defendants.            )
                                           )
_____             )

     Presently before the court are three Motions to Dismiss; one
filed by Defendant Ed Curly, one by Defendant Paul Bensi, and one
by Defendant Able Engineering Services ("Able").[1]  Having
considered the submissions of the parties and heard oral argument,
the court grants the motions and adopts the following Order.

**I.   Background**

     The facts of this case are well known to the parties, as the
operative complaint is now in its fifth iteration and spans
approximately three hundred paragraphs.  To summarize, Plaintiffs

_____

     [1] Various Defendants have also joined in each others' motions.

are members of Local 501, a local union within the International Union of Operating Engineers.  Defendant Curly is Local 501's Business Manager.  Operating engineers work in the construction and services industries, as well as in the operation and maintenance of building and industrial complexes.  Defendant ABM is in the building and facilities maintenance business, and has employed members of Local 501.  Defendant Sneekes has worked for AMB in a management capacity.  Defendant Scranton served as ABM's President.  Defendant Able also employs engineers and Local 501 members.  Defendant Bensi is Able's CEO.

Able, ABM, and Local 501 are parties to several collective bargaining agreements ("CBAs").  The CBA provides for the maintenance of multiemployer funds, including the Operating Engineers Local 501 Security Fund (the "Health and Welfare Fund") and the Southern California Joint Apprenticeship Committee (the "Training Trust") (collectively, "the Trusts").  The Health and Welfare Fund provides health and medical benefits to plan participants, while the Training Fund provides training to certain employees.  Defendants Curly and Bensi served as trustees of both the Health and Welfare Fund and the Training Trust.  Defendants Sneeks, Scranton, and Bensi served as trustees of the Training Trust.

The CBAs require that signatory employers such as Able and ABM make contributions to the Trusts.  Plaintiffs' Fifth Amended Complaint ("FAC") alleges that Able and ABM (collectively, "the Employers") breached their contribution obligations in three

different ways.[2]  First, the FAC alleges that Able did not report all hours worked by Local 501 members.  (FAC ¶ 38.)  Able's contributions to the Health and Welfare Fund were calculated on an hourly basis.  (FAC ¶¶ 35, 37.)  Thus, by under-reporting the number of hours worked, Able underpaid into the Health and Welfare Fund.  The FAC alleges that the Health and Welfare Fund's resulting "poor financial condition" led to increased out of pocket healthcare costs for both retirees and active union members participating in the Health and Welfare Fund.

Second, the FAC alleges that, under the CBAs, Able must provide the names and contact information of all employees in new, non-unionized buildings to Local 501 to allow Local 501 to attempt to organize those employees.  Able allegedly circumvented this obligation through "internal double-breasting," or sending non-union employees to buildings that otherwise would have to be opened for organizing.  (FAC ¶ 62.)  The FAC alleges that, had Able provided the required information, "the percentage of properties opting to organize under Local 501 would be very high . . . ."  (FAC ¶ 71.)  The lack of utilization of union members allegedly resulted in "substantial lost contributions to Trusts."  (FAC ¶ 68.)

Lastly, the FAC alleges that Able overused retired employees to fill temporary vacancies.  (FAC ¶ 74.)  Although the FAC alleges that "a policy" allowed Able to use retirees for up to forty hours per month, the FAC alleges that Able instead designated retired

---

[2] Able filed a Motion to Dismiss, in which ABM joins.  The FAC alleges that both Able and ABM engaged in the same wrongful acts. Because the parties discuss the issues with respect to Able, as the moving party, this Order does so hereinafter as well.

1  employees as independent contractors and used them for more than
2  forty hours a week, thus reducing the number of union member
3  employee hours worked and, accordingly, the amount Able paid into
4  the two Trusts.  (FAC ¶¶ 76-77.)

5      The FAC further alleges that Defendants Curly, Bensi, Sneeks,
6  and Scranton (collectively, the "Trustee Defendants") breached
7  their fiduciary duties to the two Trusts by allowing Able to get
8  away with its various underpayment schemes.  The FAC alleges six
9  causes of action under the Employee Retirement Income Security Act
10  of 1974 ("ERISA") and one common law cause of action for breach of
11  fiduciary duty.  The moving defendants, between their three,
12  separately-filed motions, now seek dismissal of all seven causes of
13  action.

14  **II.  Legal Standard**

15      A motion under Federal Rule of Civil Procedure 12(b)(1) may
16  challenge the court's jurisdiction facially, based on the legal
17  sufficiency of the claim, or factually, based on the legal
18  sufficiency of the jurisdictional facts.  <u>White v. Lee</u>, 227 F.3d
19  1214, 1242 (9th Cir. 2000)(citing 2 James Wm. Moore et al., <u>Moore's</u>
20  <u>Federal Practice</u>  12.30[4], at 12-38 to 12-41 (3d ed.1999)).  Where
21  the motion attacks the complaint on its face, the court considers
22  the complaint's allegations to be true, and draws all reasonable
23  inferences in the plaintiff's favor.  <u>Doe v. Holy See</u>, 557 F.3d
24  1066, 1073 (9th Cir. 2009).  Article III standing is a matter of
25  subject matter jurisdiction.  <u>DaimlerChrysler Corp. v. Cuno</u>, 547
26  U.S. 332, 441-42 (2006).  The party invoking federal jurisdiction
27  bears the burden of establishing standing.  <u>Id.</u>
28

A complaint will survive a motion to dismiss under Rule 12(b)(6) when it contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  When considering a Rule 12(b)(6) motion, a court must "accept as true all allegations of material fact and must construe those facts in the light most favorable to the plaintiff."  Resnick v. Hayes, 213 F.3d 443, 447 (9th Cir. 2000).  Although a complaint need not include "detailed factual allegations," it must offer "more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  Iqbal, 556 U.S. at 678.  Conclusory allegations or allegations that are no more than a statement of a legal conclusion "are not entitled to the assumption of truth." Id. at 679.  In other words, a pleading that merely offers "labels and conclusions," a "formulaic recitation of the elements," or "naked assertions" will not be sufficient to state a claim upon which relief can be granted.  Id. at 678 (citations and internal quotation marks omitted).

"When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement of relief." Id. at 679. Plaintiffs must allege "plausible grounds to infer" that their claims rise "above the speculative level." Twombly, 550 U.S. at 555. "Determining whether a complaint states a plausible claim for relief" is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Iqbal, 556 U.S. at 679.

**III. Discussion**

A.  Plaintiffs' Standing to Bring Claims I and IV

1.  Health and Welfare Fund

Plaintiffs First Claim is brought pursuant to ERISA Sections 502(a)(2) and 409 on behalf of the Health and Welfare Fund against Defendants Curly, Scranton, and Bensi.  Plaintiffs allege that these defendants breached their fiduciary duties by allowing Able to under-contribute to the Health and Welfare Fund, and seek restitution to the Plan for resulting losses as well as injunctive relief removing Curly, Scranton, and Bensi as Trustees.  (FAC ¶¶ 164-165.)  The Fourth Claim alleges similar claims against all of the Trustee Defendants on behalf of the Training Trust, and seeks "equitable and declaratory relief, including an order requiring Defendants . . . to 'make whole' the ERISA-governed plans . . . harmed by Defendants."  (FAC ¶ 213.)

Defendants Curly and Bensi argue that Plaintiffs lack standing to bring the First and Fourth Claims.  The parties do not dispute that ERISA plan participants may bring suit against fiduciaries for losses resulting from a breach of fiduciary duty.  See 29 U.S.C. §§ 1109, 1132(a).  Such Plaintiffs must, however, possess Article III standing.  Glanton ex rel. ALCOA Prescription Drug Plan v. Advance PCS, Inc., 465 F.3d 1123, 1124 (9th Cir. 2006).  The elements of standing are well established: the party must have suffered (1) an "injury in fact - an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical"; (2) "there must be a causal connection between the injury and the conduct complained of – the

6

injury has to be fairly traceable to the challenged action of the defendant . . ."; and (3) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560-61 (1992). (alterations, citations, and internal quotation marks omitted).  Curly and Bensi contend that, with respect to the Health and Welfare Fund claim, Plaintiffs have not suffered an injury in fact attributable to the Trustee Defendants, and, even if they had, cannot show that any such injury is redressable here.

Plaintiffs' FAC alleges that, because of the Trustee Defendants' failure to ensure that the Employers made the required contributions to the Health and Welfare Fund, participants in the Fund were forced to pay higher healthcare costs than would otherwise have been necessary.[3]  (FAC ¶ 164, Opposition to Curly Motion at 6.)  Implicit in this claim is the assumption that, had the Trustee Defendants pursued available remedies against the Employers, those efforts would have succeeded in obtaining the allegedly underpaid amounts and that the recovery of those amounts would necessarily have resulted in a corresponding decrease in the healthcare premiums charged to plan participants.  That assumption is mistaken for several reasons.

First, to the extent Plaintiffs allege that under-reporting of hours worked caused a shortfall in contributions to the Fund, that allegation is inconsistent with the terms of the CBAs.  The FAC alleges that employer contributions were calculated on an hourly basis, and that once an employee worked the minimum number of hours

---

[3] The term "Trustee Defendants," when used in the context of the Health and Welfare Fund discussion, excludes Defendant Sneeks.

necessary to establish eligibility, "the employer was obligated to contribute money for *each hour worked by the employee*." (FAC ¶ 37 (emphasis original)).  That does not appear to be correct.  The CBAs provide that a monthly, not hourly, contribution is due for every employee who worked 72 hours, or alternative amounts for employees working less than 72 hours.  (Declaration of Ed Curly, Ex. 1 at, e.g., 26.)  No additional contribution was due for employees working more than 72 hours.  Plaintiffs do not address this point or explain how, in light of the monthly contribution structure, under-reporting of hours worked in excess of 72, or the Trustees' alleged acquiescence to that practice, caused any injury to the Health and Welfare Fund, let alone to Plaintiffs.

Nor is it clear that the Trustee Defendants' alleged tolerance of the Employers' retiree overuse caused Plaintiffs any direct harm.  Plaintiffs allege that Employers' classification of retirees as independent contractors reduced the payments into the Health and Welfare Fund that would have been due if the workers had been classified as employees.  (FAC ¶ 76.)  The FAC does not allege, however, that this practice violated the CBAs.  Rather, the FAC alleges that the Employers "misused" a "policy" regarding the use of retirees in temporary positions.  (FAC ¶¶ 74-75.)  Absent any alleged breach of the CBAs, it is unclear whether the Trustees had any recourse against the Employers, and thus how the Trustees could have caused any harm to the Fund, let alone to Plaintiffs themselves.

With respect to the "internal double breasting" theory, the FAC alleges that the Employers breached the CBA by utilizing non-union workers at certain buildings without opening those buildings

1  to Local 501's organizing efforts.  (FAC ¶ 62.)  Had the Employers
2  opened those buildings, the FAC alleges, some of the properties
3  would have chosen to organize, and, therefore, the Employers would
4  have had to make greater contributions to the Health and Welfare
5  Fund.  (Id. ¶ 63.)  These allegations are too conjectural and
6  conclusory to constitute an injury in fact attributable to the
7  Trustee Defendants.  First, Plaintiffs speculate that Local 501
8  would have successfully organized non-unionized employees if the
9  Defendant Trustees had policed the Employers' use of such workers.
10 The FAC does not, however, identify how many facilities should have
11 been opened to Local 501, how many workers were employed at those
12 buildings, or how successful Local 501 has been at organizing new
13 facilities in the past.  Instead, the FAC only, and conclusorily,
14 alleges that "[p]ast organizing experience and history confirms
15 that at least some portion of the workers at non-union properties
16 would have become union members, given the better pay and benefits
17 available."  (FAC ¶ 70.)

18      Even assuming that "some" workers would have organized,
19 however, the FAC does not adequately allege that the resulting
20 increase in payments to the Health and Welfare Fund would have had
21 any effect on Plaintiffs' contributions.  Plaintiffs do not
22 seriously address this argument, contending only that it is "silly,
23 since there would not be the same reason to raise health costs for
24 members if the Fund had millions more in it from employers."[4]
25 (Opp. to Curly Mot. at 7:12-14.)  But there is no plausible
26 allegation in the FAC that the addition of "some" unionized workers

27 _____

28      [4] Trustees' potential reasoning for setting certain
    contribution rates is discussed in further detail below.

1  would have resulted in "millions" more in the Health and Welfare

2  Fund.  Nor does the FAC support any inference that additional

3  payments due on behalf of "some" additional workers would have

4  driven down the Fund's, or Plaintiffs', healthcare expenses.

5  Granted, a significantly wealthier fund or a health plan covering a

6  much larger pool of insureds might be able to negotiate better

7  rates from insurers, and might pass those savings on to its

8  members.[5]  But there is no allegation in the FAC, and no reason to

9  believe, that the mere addition of "some" additional funds or plan

10  members would have had any effect on the Fund's costs or

11  participants' required individual contribution rates.

12      The second major flaw in Plaintiffs' standing argument,

13  whether considered as a problem of attribution or redressability,

14  is encapsulated by Plaintiffs' assertion that "there would not be

15  the same reason to raise health costs for members if the Fund had

16  millions more in it from employers."  (Opp. to Curly Mot. at 7:12-

17  14.)  Plaintiffs' statement reflects the mistaken assumption that

18  an increase in Fund assets necessarily correlates to a decrease in

19  employee contribution rates, while at the same time implicitly

20  acknowledging that those rates are not the product of some lockstep

21  formula, but rather are set for a particular reason.[6]

22      "There is no redressability, and thus no standing, where . . .

23  any prospective benefits depend on an independent actor who retains

24  broad and legitimate discretion the courts cannot presume either to

25  control or to predict."  Glanton, 465 F.3d at 1125.  Defendants

26  _____

27      [5] See note 4, supra.

28      [6] As discussed below, the parties disagree as to how employee
   rates are set.

10

1   Curly and Bensi argue that plan members' individual contribution
2   rates are set by collective bargaining, not by the Trustee
3   Defendants.  The version of the CBAs effective through October 2011
4   set forth a total contribution rate and specified the precise
5   dollar figure for which employers were responsible as well as the
6   precise figure for which employees were responsible.[7]  (Curly
7   Decl., Ex. 1 at 26.)  The current version of the CBAs is less
8   precise, stating that employers shall pay a delineated "portion" of
9   an unspecified health and welfare benefits premium, and that "if
10  the Employers portion . . . is not sufficient to meet the total
11  premium . . . then the additional amount shall be deducted from the
12  Employees' wages . . . ."  (Curly Decl., Ex. 2 at 61.)

13       Plaintiffs, seeking to distinguish <u>Glanton</u>, argue that the
14  current CBA only specifies what the employer must pay, and is
15  silent as to employee rates.  Thus, Plaintiffs, argue, their
16  contribution rates are not set by some entity or process beyond the
17  Trustee Defendants', or the court's, control.  This interpretation
18  of the CBA is not persuasive.  Although Plaintiffs are correct that
19  the current CBA does not specifically state a dollar amount for
20  which employees are responsible, it does provide that employees are
21  responsible for the residual amount of the total premium that
22  remains after the Employers have paid their share.  It is difficult
23  to see how this employee contribution, albeit an unspecified and

24

25   _____

26       [7] The prior CBA states, "It is understood that the present
     contribution rate is a total of six hundred and forty-six dollars
27   and nine cents per month . . . .  The Employer shall contribute
     five hundred and ninety dollars and sixty cents per month, and the
28   employee will contribute fifty-five dollars and forty-nine cents
     per month."  (Curly Decl., Ex. 1 at 26 (parentheticals omitted).)

1  potentially fluctuating one, is not the product of collective

2  bargaining rather than the Trustee Defendants' actions.

3      In addition, although Plaintiffs argue that "Defendants and

4  their fellow trustees make the relevant decisions about total

5  premiums (and, thus, union member contributions)[,]" there is no

6  such allegation in the FAC.  Even if Plaintiffs had alleged that

7  the Trustee Defendants independently set Plaintiffs' contribution

8  rates, the injury alleged here is not likely redressable by a

9  decision in this case.  First, Trustees take many factors into

10  account when determining contribution rates.  Even if Plaintiffs

11  were successful here and were to recover additional assets on

12  behalf of the Health and Welfare Fund, it is not clear, let alone

13  likely, that the Trustees would opt to reduce employee payments

14  rather than shore up a fund that, in Plaintiffs' own words, is in

15  "poor financial condition."

16      Second, and more importantly, a decision here against the

17  Trustee Defendants would not require the Trustees of the Health and

18  Welfare Fund to reduce Plaintiffs' rates for the simple reason that

19  not all Trustees of the Fund have been named in this suit.[8]  This

20  Court, therefore, has no power to grant Plaintiffs the relief they

21  seek.  Plaintiffs do not dispute that the Trustee Defendants cannot

22  themselves make decisions on behalf of the Fund.  Nevertheless,

23  Plaintiffs make the astonishing claim that this Court "plainly has

24

25      [8] This case is therefore distinguishable from Slack v. Int'l
    Union of Operating Engrs., 83 F.Supp.3d 890 (N.D. Cal. 2015)
26  ("Slack II"), which rejected a redressability challenge to standing
    where the court found no Glanton-like independent actor involved in
27  setting contribution levels and where the Plaintiff appears to have
    sued all of the trustees, both management and union side, of ERISA
28  funds.

power . . . and the right to order appropriate relief" because "Defendant Curly . . . effectively controls the votes and positions of his fellow union-side Trustees of the [Health and Welfare] Fund and Training Trust.  The union-side Trustees serve at his pleasure . . . .  Thus, to the extent this Court were to order Curly to take steps to remedy his fiduciary breaches, Curly could readily obtain the acquiescence and approval of his fellow union-side trustees . . . ."  (Opp. to Curly Mot. at 9, n. 9 (quoting FAC ¶ 32.))  The FAC includes no factual allegations, let alone plausible ones, to support these wide-ranging assertions about Curly's influence over his fellow trustees or their malleability.

        2.  Training Trust

        This Orders's discussion thus far, like the parties' arguments, has focused on claims regarding the Health and Welfare Fund rather than the Training Trust.  Curly and Bensi's particularity and redressability arguments are equally, if not more, powerful with respect to the Fourth Cause of Action regarding the Training Trust.  The FAC alleges the same theories of harm, namely, under-reporting of hours, overuse of retirees, and internal double-breasting, with respect to both the Health and Welfare Fund and the Training Trust.  (FAC ¶¶ 53, 63)  The redressability discussion above applies to the Training Trust as well, and the court need not repeat it.

        The Training Trust claim faces even greater hurdles, however, than the Health and Welfare Fund claim with respect to particularity.  This is because, unlike the Health and Welfare Fund, the Training Trust does not require any contributions from employees, and employers bear the entire cost.  Plaintiffs,

1   therefore, cannot and do not allege that the supposed under-funding
2   of the Training Trust caused them any additional expense.  Rather,
3   Plaintiffs contend that deficiencies in Training Trust assets
4   resulting from the Trustee Defendants' breaches of their fiduciary
5   duties "would necessarily have reduced the training available to
6   participants."  (Opp. to Curly Mot. at 11:21.)  But the FAC does
7   not allege that Plaintiffs were ever denied specific training or
8   would have received more or better training.  Instead, Plaintiffs
9   cite Lujan for the proposition that "general allegations embrace
10  those specific facts that are necessary to support the claim," as
11  if to suggest that their general allegation that Training Trust
12  assets were reduced is sufficient to establish particularized harm
13  to them.  Lujan, 504 U.S. at 561.  The court declines to read Lujan
14  in such a way that would essentially dispense with the
15  particularized injury requirement by allowing a general allegation
16  to somehow imply the specific facts necessary to establish an
17  injury in fact.  Plaintiff relies heavily upon the court's
18  statement in Mendoza v. Goff that an "allegation that the Plan was
19  injured by the alleged misuse of Plan funds, and that plaintiff
20  seeks recovery on behalf of the Plan, is sufficient to show injury,
21  causation, and redressability."  Mendoza v. Goff, No. C 13-4773
22  PJH, 2014 WL 10748573 at *2 (N.D. Cal. Apr. 16, 2014).  This court
23  respectfully disagrees with the Mendoza court's conclusion, and
24  notes that the very brief Order in Mendoza does not discuss what
25  type of plan was at issue or what the alleged breach of fiduciary
26  duty entailed, does not mention Lujan, and does not discuss or
27  analyze Article III standing beyond the single sentence quoted
28  above.  The general allegation here that the Training Trust was

14

1   deprived of assets it otherwise might have used for training

2   purposes is not sufficient to establish that Plaintiffs themselves

3   suffered a particularized harm.

4        For these reasons, the FAC fails to allege an injury in fact

5   attributable to the Trustee Defendants or redressable in this

6   action.  Plaintiffs' First and Fourth Causes of Action for breach

7   of fiduciary duty under ERISA § 502(a)(2) are dismissed with

8   prejudice.[9]

9        B.   Claims II and V

10       Like Plaintiffs' First and Fourth causes of action, the Second

11  and Fifth causes of action allege ERISA violations against the

12  Trustee Defendants with respect to the Health and Welfare Fund and

13  Training Trust, respectively.  Unlike the First and Fourth claims,

14  however, the Second and Fifth claims allege causes of action for

15  equitable relief under ERISA Section 502(a)(3), not Section

16  502(a)(2).

17       The parties appear to agree that Plaintiffs need not

18  demonstrate direct injury or loss in order to have standing to

19  bring an equitable relief claim pursuant to ERISA Section

20  502(a)(3).[10]  See, e.g., Slack v. Int'l Union of Operating Engrs.,

21  No. C-13-5001 EMC, 2014 WL 4090383 at *13 (N.D. Cal. Aug. 19, 2014)

22  ("Slack I").  For that reason, the deficiencies in Plaintiffs'

23  _____

24       [9] Having dismissed these claims for lack of Article III
    standing, the court need not address Defendants' arguments with

25  respect to statutory standing.  In any event, those arguments do
    not apply to Plaintiff Menor, and would not be dispositive of any

26  claim in its entirety.

27       [10] Although Defendant Bensi's motion initially argued that the
    direct injury standing issues discussed above with respect to

28  Claims I and IV also apply to Claims II and V, he appears to have
    abandoned that position.

1   First and Fourth claims, discussed above, are not fatal to the

2   Second and Fifth claims.[11]

3       Defendant Bensi argues, however, that Claims II and V must be

4   dismissed because they are predicated upon the same alleged

5   breaches and seek the same relief as claims I and IV.  In <u>Varity</u>

6   <u>Corp. v. Howe</u>, 516 U.S. 489 (1996), the Supreme Court held that an

7   individual could bring suit for "appropriate" equitable relief

8   under Section 502(a)(3)'s catchall provision where Sections

9   502(a)(1) and (a)(2) were not available.  <u>Varity</u>, 516 U.S. at 507,

10  515; <u>See also</u> <u>Slack I</u>, 2014 WL 4090383 at *14 ("[W]here another

11  provision of ERISA provides an adequate remedy, relief under §

12  1132(a)(3) is not appropriate.").  Here, Claims II and V incorporate

13  the allegations regarding breach of fiduciary duty in Claims I and

14  IV, respectively.  (FAC ¶¶ 171, 217.)  Claims II and V do not,

15  however, incorporate the allegations of Claims I and V with respect

16  to the relief sought.  (<u>Id.</u>)  Plaintiffs acknowledge that all four

17  claims request injunctive relief, but contend the "specific

18  injunctions requested in the Second claims are <u>not</u> requested as

19  relief under the First Claim," and that the Fifth and Fourth claims

20  similarly seek different specific injunctions.  (Opp. to Bensi Mot.

21  at 21.)

22      Plaintiffs suggest that it would be premature to conclude that

23  the First and Fourth claims provide an adequate remedy, and dismiss

24  the Second and Fifth claims accordingly, because the First and

25  Fourth claims may not survive.  (Opp. to Benso Mot. at 21-22.)

26

27      [11] Section 502(a)(2) allows for monetary claims for losses to

28  ERISA plans as well as "other equitable or remedial relief as the court may deem appropriate."  29 U.S.C. §§ 1109(a), 1132(a)(2).

1    Plaintiffs rely heavily on Slack I.  There, citing Varity, the

2    court explained that "equitable relief under 29 U.S.C. § 1132(a)(3)

3    may not be obtained where a party states a claim under § 1132(a)(1)

4    or § 1132(a)(2)."  Slack I, 2014 WL 4090383 at *14.  The court

5    nevertheless declined to dismiss an arguably duplicative Section

6    502(a)(3) claim because the Defendants had also moved to dismiss

7    the plaintiff's Section 502(a)(2) claims.  Because, the court

8    reasoned, "it is sharply contested whether Plaintiffs have any

9    remedy under § 1132(a)(2) . . . [i]t would defy common sense to

10   dismiss Plaintiffs' relief claims at the pleading stage simply

11   because they have also pleaded claims for monetary damages to the

12   Plan under § 1132(a)(2).  Id.

13        This court respectfully disagrees with the Slack I court's

14   reasoned analysis.  The plaintiffs in Varity alleged that they had

15   been tricked into withdrawing from an ERISA plan and forfeiting

16   their benefits, and sought reinstatement in the plan.  Varity, 516

17   U.S. at 492.  The Varity plaintiffs could not bring suit under

18   Section 502(a)(1) because they were no longer plan participants,

19   and could not bring suit under Section 502(a)(2) on their own, as

20   opposed to the plan's, behalf.[12]  Id. at 515.  The Court held that

21   Congress provided, through Section 502(a)(3), "other remedies for

22   yet other breaches of other sorts of fiduciary obligation" that are

23   "outside the framework of [Sections 502(a)(1) and (a)(2)] . . . ."

24   Id. at 512.

25

26   _____

27        [12] Further, a Section 502(a)(2) action to recover losses to
     the plan would not have been appropriate because the plaintiffs did
28   not allege that the plan had suffered any losses.  See Bowles v.
     Reade, 198 F.3d 752, 760 (9th Cir. 1999).

1    Here, in contrast, the FAC itself states that the Second and

2  Fifth claims are premised on the exact same fiduciary obligations

3  and breaches as the First and Fourth claims.  Although Plaintiffs'

4  Section 502(a)(3) claims purport to seek distinct relief, those

5  claims appear to seek to enforce the same rights as the Section

6  502(a)(2) claims.  There is no dispute that Plaintiffs, as plan

7  participants, are entitled to bring suit under Section 502(a)(2).

8  Were Plaintiffs to succeed on their Section 502(a)(2) claims and

9  obtain the monetary and injunctive relief they seek, it is

10  difficult to see how such relief would be in any way inadequate.

11    The Slack I court's decision to allow simultaneous claims

12  under Sections 502(a)(2) and (a)(3) appears to have looked not to

13  whether the plaintiff's Section 502(a)(2) claims involved a

14  separate set of fiduciary obligations or types of fiduciary

15  breaches, or to whether Section 502(a)(2) adequately protected the

16  plaintiff's rights, but rather to whether the plaintiff's Section

17  502(a)(2) claim would prove successful.  As the Eleventh Circuit

18  has held, however, "the availability of an adequate remedy under

19  the law for Varity purposes[] does not mean, nor does it guarantee,

20  an adjudication in one's favor."  Ogden v. Blue Bell Creameries

21  U.S.A., Inc., 348 F.3d 1284, 1287 (11th Cir. 2003).  Here, although

22  Plaintiffs' Section 502(a)(2) claims may not be sufficiently

23  pleaded, the remedies afforded by that section appear appropriate

24  to the types of obligations and breaches at issue.  See Bowles, 198

25  F.3d at 759-760.

26    Accordingly, Plaintiffs' Second and Fifth causes of action are

27  dismissed, with prejudice.

28    C.   Claims III and VI

1   Claims III and VI are alleged against not against the Trustee

2   Defendants, but against Able and ABM.  Claim III alleges, pursuant

3   to Sections 404 and 502(a)(3), that the Employers knowingly

4   participated in the Trustee Defendants' fiduciary breaches by

5   intentionally avoiding their employer contribution obligations with

6   knowledge of the Trustee Defendants' failure to enforce the CBAs,

7   as well as by participating in prohibited transactions by accepting

8   improper extensions of credit in the form of withheld

9   contributions.[13]  (FAC ¶¶ 178-183, 233-235.)  Plaintiffs now

10  concede, however, that unpaid contributions are not trust assets,

11  and that the Employers' alleged delinquencies do not qualify as

12  prohibited transactions.  (Opp. to Able Mot. at 7 n. 8, citing Bos

13  v. Board of Trustees, 795 F.3d 1006, 1009 (9th Cir. 2015).)

14  Unlike certain other ERISA provisions, Section 502(a)(3) does

15  not expressly limit liability to fiduciaries.  Harris Trust and

16  Savings Bank v. Salomon Smith Barney, Inc., 530 U.S. 238, 245

17  (2000).  Plaintiffs are therefore correct that, under Harris, they

18  may bring suit against Able under Section 502(a)(3).  Able argues

19  that, even if it is a proper defendant, it cannot be liable for the

20  Trustee Defendants' alleged breach of fiduciary duty because it

21  never possessed trust assets or engaged in a prohibited

22  transaction.  (Reply at 9.)

23  Plaintiffs devote much of their opposition to arguments that

24  the two Trusts suffered losses due to unpaid contributions.  (Opp.

25  to Able Motion at 8-11.)  But even assuming that to be true, and

26  putting aside the plausibility problems with those allegations,

27

28  [13] Section 404 delineates the duties of ERISA fiduciaries.  29
U.S.C. § 1104.

1   discussed above in the context of Article III standing, it is
2   unclear to the court how Able is responsible for the Trustee
3   Defendants' alleged breaches.  The non-fiduciary defendant in
4   Harris, by comparison, was alleged to have played a far more active
5   role when it induced a fiduciary to purchase worthless property
6   interests, and thereby engage in a per se prohibited transaction.
7   Harris, 530 U.S. at 242-43.  Here, now that Plaintiffs have
8   conceded that Able did not engage in prohibited transactions, the
9   only remaining allegations are that, by failing to make
10  contributions, Able "jointly participated in harming the Plan[s]"
11  along with the Trustee Defendants, and that Able knew the Trustee
12  Defendants "were failing to collect unpaid contributions . . . in
13  violation of their duties as ERISA trustees."  (FAC ¶¶ 181-182.)
14  To be clear, the FAC does not and cannot allege that Able's
15  nonpayment constituted a breach of a fiduciary duty.  The only
16  breach alleged is that the Trustee Defendants failed to pursue
17  remedies against Able.  Able's mere, albeit knowing, acquiescence
18  to the Trustee Defendants' alleged inaction is insufficient to
19  establish participation in that alleged breach.
20      For these reasons, Claims III and VI are dismissed with
21  prejudice.
22      D.   Claim VII
23      Plaintiff's Seventh Claim alleges a California common law
24  cause of action for breach of fiduciary duty against Defendant
25  Curly and against Able and ABM as aiders and abettors.  (FAC ¶¶
26  247, 253.)  This claim is premised solely upon the "internal double
27  breasting" theory, discussed above.  As discussed above,
28  Plaintiffs' internal double breasting theory is too conjectural, as

20

1  it assumes, without sufficient factual basis, that Local 501 would
2  have successfully organized "some" additional employees.[14]  Curly
3  and Able also argue, however, that Claim VII is preempted by the
4  Labor Management Relations Act ("LMRA").

5      The pre-emptive force of some federal statutes is so powerful
6  that it converts any state common-law claim into a federal claim
7  arising under federal law.  Caterpillar Inc. v. Williams, 482 U.S.
8  386, 393 (1987).  This complete preemption doctrine is construed
9  narrowly, and applies only to federal statutes of "extraordinary"
10 preemptive effect.  Holman v. Laulo-Rowe Agency, 994 F.2d 666, 668
11 (9th Cir. 1993).

12     The LMRA is one of those extraordinary statutes that sometimes
13 preempts state law claims.  Id.  Section 301 of the LMRA provides:

14         [s]uits for violation of contracts between an employer
           and a labor organization representing employees in an
15         industry affecting commerce as defined in this chapter,
           or between any such labor organization, may be brought
16         in any district court of the United States having
           jurisdiction of the parties[.]
17 29 U.S.C. § 185(a).  Despite the limiting reference in § 301 to
18 "[s]uits for violation of contracts," courts construe the complete
19 preemption doctrine to also cover state law actions requiring
20 interpretation of a labor agreement.  Balcorta v. Twentieth
21 Century-Fox Film Corp., 208 F.3d 1102, 1108 (9th Cir. 2000).  The
22

23 ─────────────────

24      [14] In this context, the vagueness of Plaintiffs' allegation
   that "some" employees would have chosen to unionize is less
25 problematic than in the ERISA Section 502(a)(2) context.  The harm
   alleged here is that Local 501 was deprived of dues it may have
26 received had new employees joined the union.  (FAC ¶¶ 238-39.)  In
   the Section 502(a)(2) context, it is unclear whether the addition
27 of "some" additional employees and contributions would have any
   impact on the employee healthcare costs.  It is more likely,
28 however, that the addition of any new union members would have
   resulted in increased union revenues.

1   Supreme Court, however, "has distinguished between claims that

2   require interpretation or construction of a labor agreement and

3   those that require a court simply to 'look at' the agreement."   Id.

4   Mere references to a CBA in a defense to a state law claim do not

5   result in preemption of those claims.   Vasserman v. Henry Mayo

6   Newhall Memorial Hosp., 65 F. Supp. 3d 932, 952 (C.D. Cal. 2014).

7   Rather, a state law claim will only be preempted if it is so

8   "inextricably intertwined" with a CBA that resolution of the claim

9   will require judicial interpretation of the CBA's terms.   Id.

10       This court must conduct a two-step analysis to determine

11   whether a state claim is preempted.   Burnside v. Kiewit Pac. Corp.

12   491 F.3d 1053, 1059 (9th Cir. 2007).   First, the court must

13   determine if the particular rights at issue inhere in state law or

14   are grounded in a CBA.   Id. at 1060.   If the right exists solely

15   because of a CBA, then the claim is preempted.   Id. at 1059.   If

16   the right derives from state law, the court must then determine

17   whether the right is "substantially dependent on analysis" of a

18   CBA.   Id.   If the court can merely "look to" the CBA, the claim is

19   not "substantially dependent" on a CBA, and the claim is not

20   preempted.   Id. at 1060.   If the court must "interpret" the CBA,

21   the claim is "substantially dependent" on the CBA, and is

22   preempted.   Id.

23       Here, the FAC alleges that Curly breached fiduciary duties to

24   Local 501 "by allowing (and failing to remedy) the conduct of

25   Defendants Able and ABM . . . ."  (FAC ¶ 241.)  Able and Curly

26   argue that the Seventh Claim would not exist absent some obligation

27   imposed by the CBAs, and that the right Plaintiffs seek to enforce

28   therefore also stems from the CBAs.   The court disagrees.   Although

1   the precise acts required of Curly in fulfilment of his fiduciary

2   duties do depend on the terms of the CBAs, Plaintiffs' common law

3   claim does not seek to enforce any right under the CBAs, but rather

4   to hold Curly accountable for his alleged breaches.  Plaintiffs

5   possess that right regardless what the CBA itself says.

6        This conclusion does not, however, end the court's inquiry.

7   The court must proceed to determine whether Plaintiffs' claims are

8   preempted because, although they do not arise from the CBAs, they

9   "substantially depend[] on" interpretation of the CBAs.  Burnside,

10  491 F.3d at 1070.  "[T]he 'look to'/'interpret' distinction 'is not

11  always clear or amenable to a bright line test."  Burnside at 1060.

12  A defendant asserting § 301 preemption cannot simply allege

13  hypothetical or "creative" connections to a plaintiff's claim.

14  Vasserman, 65 F.Supp.3d at 952.  Rather, the plaintiff's claim

15  itself is the "touchstone" for the preemption analysis.  Cramer v.

16  Consol. Freightways, Inc., 255 F.3d 683, 691 (9th Cir. 2001) (en

17  banc).

18       Questions of state law based upon terms of a CBA that are not

19  actually in dispute do not provide a basis for preemption of a

20  state-law claim.  Livadas v. Bradshaw, 512 U.S. 107, 124-25 (1994).

21  In Burnside, the Ninth Circuit addressed a state-law action for

22  failure to compensate employees for travel time.  Burnside, 491

23  F.3d at 1055.  California Industrial Welfare Commission ("IWC")

24  Wage Order 16-2001 required employers to compensate employees for

25  all employer-mandated travel, unless a collective bargaining

26  agreement expressly provided otherwise.  Id. at 1062.  The court

27  concluded that only a cursory examination of the CBA was needed to

28  determine that the express waiver required by Wage Order 16-2001

23

1  was not included, and that such a cursory examination did not

2  trigger § 301 preemption.  <u>Id.</u> at 1071.  Even a collective

3  bargaining agreement involving "fairly complicated procedures and .

4  . . a hefty dose of industry jargon," however, does not necessarily

5  implicate § 301 preemption where the meaning of the provisions is

6  not ambiguous.  <u>Balcorta v. Twentieth Century-Fox Film Corp.</u>, 208

7  F.3d 1102, 1109-10 (9th Cir. 2000).

8       Here, however, it appears that resolution of this claim would

9  require the court to interpret the CBAs to determine whether the

10  alleged "internal double breasting" to which Curly allegedly turned

11  a blind eye was permitted by the CBA.  Although the FAC does not

12  highlight any specific contractual provision, it does state that

13  Claim VII is based on harm to Local 501 and its members "[d]ue to

14  CBA Circumvention Activities of Able and ABM."  (FAC at 67.)  The

15  Employers' obligations, which Curly bore the duty to police, appear

16  to stem from language in Article I(G) of the current CBA.[15]

17  Article I(G) states that the CBA "shall apply to and cover all

18  buildings which are built, and thereafter operated . . . by

19  Employer signatory hereto employing employees in the classification

20  listed in this Agreement who perform work as described in this

21  Agreement."  (Curly Decl., Ex. 2 at 44.)  Article I(G)(3) states

22  that, "[w]ith regard to buildings which are serviced, managed, or

23  operated . . . on a date subsequent to the date of this Agreement,

24  the Employer agrees to notify the Union in writing when the

25  Employer begins negotiations for a contract . . . ."  (<u>Id.</u> at 46.)

26

27

28       [15] Article I(F) of the prior CBA contains similar language.

1    Plaintiffs' oppositions provide one interpretation of this CBA
2    language:  "In other words, when Able and ABM service, manage or
3    operate buildings . . . at which they employ stationary engineers,
4    the [CBA] terms apply to those buildings, and Able and ABM must
5    provide notice to Local 501 when it starts negotiating a contract
6    to service, manage or operate such buildings."  (Opp. to Curly Mot.
7    at 23; Opp. to Able Mot. at 21 n.19.)  Although that interpretation
8    of the relevant language appears to be a reasonable and fairly
9    straightforward one, it is not clear that it is the only possible
10   interpretation.  Indeed, the FAC itself appears to adopt a
11   different interpretation.  The FAC alleges, with respect to the
12   internal double breasting that underlies Claim VII, that the CBAs
13   require Employers "to provide the names and contact information for
14   all employees in non-unionized buildings added after the entry of
15   the most recent labor contract."  (FAC ¶ 61.)  Neither the plain
16   language of the CBA, quoted above, nor Plaintiffs' interpretation
17   of that language as stated in their opposition makes any mention of
18   employee names and contact information.  Thus, it appears that the
19   CBA language at issue is open to at least two interpretations,
20   between which this court would have to choose in the course of
21   determining whether Able violated the CBAs in the first instance.
22   Because resolution of Claim VII might substantially depend on
23   interpretation of the CBA, Claim VII is preempted.  Claim VII is,
24   therefore, dismissed with prejudice.
25
26
27
28

**IV.   Conclusion**

     For the reasons stated above, the motions to dismiss are GRANTED.   The Fifth Amended Complaint is DISMISSED, with prejudice.


IT IS SO ORDERED.


Dated: September 2, 2016

                                        DEAN D. PREGERSON
                                        United States District Judge